UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DONALD RUSHTON,

                Plaintiff,

v.

EXPERI-METAL, INC.,

                Defendant.

_____/

Case No. 19-cv-11318

Paul D. Borman
United States District Judge


**OPINION AND ORDER GRANTING DEFENDANT EXPERI-METAL, INC.'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 17)**

      This is an employment discrimination case in which Plaintiff Donald Rushton alleges that he was subjected to a racially hostile work environment during his three-and-a-half year employment with Defendant Experi-Metal, Inc. as a press operator, and that he was constructively discharged in retaliation for complaints he made regarding treatment he experienced because of his race. Now before the Court is Defendant's Motion for Summary Judgment (ECF No. 17). The motion is fully briefed. The Court held a hearing using Zoom videoconference technology on December 11, 2020, at which counsel for Plaintiff and Defendant appeared. For the reasons that follow, the Court GRANTS Defendant's Motion for Summary Judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

**A.      Factual Background**

### 1.  Defendant EMI

Defendant Experi-Metal, Inc. ("Defendant" or "EMI") is based in Sterling Heights, Michigan and manufactures mobility products, such as prototype manufacturing, aircraft parts, and military cab fabrication. (ECF No. 17, Def.'s Mot. at pp. 2-3, PgID 78-79.) EMI employs approximately 135 to 150 employees at a given time, (ECF No. 17-2, Sandy Domzalski Deposition Transcript ("Domzalski Dep.") at p. 32, PgID 113,) and has a Policy Against Discrimination and Harassment which states that the Company prohibits harassment on the basis of race or any other protected characteristic. (ECF No. 17-3, EMI Employee Handbook, PgID 138.) Employees who experience or witness harassing behavior are required to bring it to the attention of the Human Resources Manager, a member of Executive Management, or to the President of the Company. (*Id.* PgID 139.) EMI's policy is to "investigate all concerns about unlawful harassment and discrimination thoroughly and promptly, and to take appropriate remedial steps." (*Id.*) Employees who are found to have engaged in harassment are subject to discipline, up to and including discharge. (*Id.*) EMI also prohibits "[r]etaliation in any form against an employee who makes a complaint or who cooperates in an investigation of alleged

discrimination or harassment," and any employee who engages in retaliation is subject to disciplinary action, up to and including discharge. (*Id.* PgID 140.)

### 2. Plaintiff's employment with EMI

Plaintiff Donald Rushton applied for a Press Operator position with Defendant in July 2014. (ECF No. 17-4, Donald Rushton Deposition Transcript ("Rushton Dep.") at p. 49, PgID156; ECF No. 17-8, Rushton Employment Application, PgID 221-26.) He then interviewed with Human Resources Manager Sandy Domzalski, Press Room Department Head Chuck Isaacson, and General Manager Dave Maschke, and they offered Plaintiff the job. (Rushton Dep. at pp. 54-56, PgID 157.) Plaintiff accepted the offer and began his employment with Defendant on August 18, 2014, as a trainee in the Press Room at a pay rate of $15 per hour. (*Id.*; Domzalski Dep. at p. 25, PgID 112.) Chuck Isaacson was Plaintiff's supervisor throughout his employment with EMI. (Rushton Dep. at p. 56, PgID 157.)

In early-2015, Plaintiff was selected to participate in Defendant's mentorship program. (Rushton Dep. at pp. 76-77, PgID 162-63.) The purpose of the mentorship program was to train less experienced employees, such as Plaintiff, so they could take over the roles held by experienced Press Operators when those operators left the company. (ECF No. 17-5, Chuck Isaacson Deposition Transcript ("Isaacson Dep.") at p. 16, PgID 209.) Employees in the program, including Plaintiff, are assigned to a variety of "mentors" during the course of the program so they can gain

3

insight and experience from a variety of different Press Operators. (*Id.* at pp. 16-17, PgID 209-10.)

Plaintiff's first mentor was Press Operator Ken Ullmann. (Rushton Dep. at p. 77, PgID 163.) Plaintiff filled out a Mentorship Program Questionnaire on or about April 24, 2015, in which he wrote about Ullman: "I believe we worked well together. I really didn't have an opportunity to work with him that much. I don't think we experienced any conflicts." (ECF No. 17-17, Mentorship Program Questionnaire PgID 237.) In response to the question asking, "[w]hat did you like least about the program?" Plaintiff wrote "[t]he short amount of time I actually got to spend working with my mentor," and he indicted "yes" to the question of whether he would like to work with his mentor again. (*Id.*)

In July 2015, Plaintiff filled out an Employee Self Review. (ECF No. 17-18, Employee Self Review, PgID 238-39.) Plaintiff did not mention anything regarding inappropriate racial conduct in the review, although he did answer "no" to the question is whether his manager (Isaacson) treated him "fairly and with respect," and wrote "someone who would treat everyone fairly" would make a great manager. (*Id.*) Plaintiff similarly did not mention inappropriate racial conduct when meeting with Domzalski to discuss his self-review, but rather he stated that Isaacson "has his crew that he takes care of" and that Plaintiff "does not want to look like a whiner or complainer." (*Id.*; Domzalski Dep. at p. 103, PgID 131; Rushton Dep. at pp. 117-19,

4

PgID 173.) Domzalski told Plaintiff that EMI cannot improve a situation if they are not aware of it, with regard to Plaintiff's comment that he believed he could be treated more fairly by Isaacson. (Domzalski Dep. at pp.103-05, PgID 131-32.)

In August, 2015, Plaintiff was promoted from trainee to "Upgrader," which is another term for "Press Operator." (Rushton Dep. at p. 135, PgID 177; ECF No. 17-6, 8/25/2015 Employee Evaluation, PgID 219; Isaacson Dep. at p. 15, PgID 209.) Plaintiff was assigned to run one of Defendant's top presses. (Isaacson Dep. at p. 37, PgID 215.)

In 2016, Defendant EMI was purchased by Quality Metalcraft, Inc. ("QMC"), and Plaintiff was selected to be EMI's hourly representative on the EMI/QMC Integration Team in October 2016. (Rushton Dep. at p. 144, PgID 179.) According to Defendant, the "primary purpose" of the Integration Team was "to discuss the corporate culture of EMI and QMC and how the cultures could be improved." (Def.'s Mot. at p. 5, PgID 81.) Plaintiff admits that he never mentioned during the team meetings that he was treated differently because he is African American, and never referred to any racial comments or incidents in the workplace. (Rushton Dep. at p. 146, PgID 180.)

During Plaintiff's tenure with Defendant, he received 11 pay raises, and by February 2018, his pay had increased by 50% from $15.00 to $22.58 per hour, the top of the pay grade for his job classification. (ECF No. 17-7, Employee Pay History,

PgID 220; Domzalski Dep. at p. 79, PgID 125.) As will be discussed further below, Plaintiff resigned on March 12, 2018. (Employee Pay History, PgID 220.)

### 3. Reported and/or alleged racial incidents during Plaintiff's employment

#### a. Reported incidents

During Plaintiff's employment, Defendant investigated and/or addressed three separate incidents involving inappropriate comments or behavior directed at or involving Plaintiff.

First, in September 2014, about a month after Plaintiff was hired, a coworker (and subsequently Plaintiff's mentor), Ken Ullmann, overheard Safety Department leader Michael Taylor tell a racially-insensitive joke to Plaintiff. (Rushton Dep. at pp. 211-12, PgID 196.) According to Plaintiff, Taylor said something to him like "what do you call a black baby who gets its wings? A bat." (*Id.*) Ullmann overheard the comment and reported the incident to Isaacson, who in turned reported it to Domzalski. (*Id.*; Isaacson Dep. at pp. 23-24, PgID 211.) Domzalski investigated the incident, and although Taylor was "extremely remorseful and very upset" when Domzalski confronted him, Defendant determined that Taylor's "joke" violated the Company's anti-discrimination policy and Taylor received a written Employee Warning Report ("EWR") and was given a one-day unpaid suspension for his conduct. (Domzalski Dep. at pp. 60-61, PgID 120-21; ECF NO. 17-14 Michael

Taylor EWR, PgID 234.) Plaintiff states that he had no negative interactions with Taylor after this incident. (Rushton Dep. at p. 213, PgID 197.)

The second incident occurred on April 28, 2015, during a shift change, when either Tony Leo, Plant Superintendent, or Tom Stewart, a manager, overheard Night Shift Supervisor Paul Tumey ask Plaintiff if he was going to "work on his tan" after work. (Rushton Dep. at pp. 95-96, PgID 167; Domzalski Dep. at p. 66, PgID 122.) Leo and/or Stewart then reported this statement to Domzalski, who investigated the incident, including obtaining a written statement from Plaintiff. (Rushton Dep. at p. 96, PgID 167; Domzalski Dep. at p. 68, PgID 122; ECF No. 19-3, Donald Rushton 4/28/2015 Written Statement, PgID 339.) In his written statement, Plaintiff writes that in response to Tumey's question, they "both kinda chuckled" and Plaintiff responded "I think I have that down packed [sic]." (Ruston 4/28/2015 Statement, PgID 339.) Rushton continued that "[i]t was very akward [sic] hearing someone say that to me" and that "[i]t wasn't the first time that I have heard remarks like this here at EMI and I'm sure it won't be the last which is why I hesitated to say anything about the matter." (*Id.*) Defendant determined that Tumey's comment violated the Company's anti-harassment policy and issued a written EWR to Tumey on April 29, 2015, and gave him a one-day unpaid suspension. (ECF No. 17-15, Paul Tumey EWR, PgID 235.) Plaintiff states that he did not have any negative interactions with Tumey after this incident. (Rushton Dep. at pp. 100-01, PgID 168-69.)

7

The third incident occurred on or about January 26, 2016, when a new employee, Jesse Bodner, had a confederate flag sticker or decal on the inside lid of his toolbox on his first day of work. (Isaacson Dep. at p. 28, PgID 212; Domzalski Dep. at p. 105, PgID 132.) When Isaacson became of aware of the sticker, through Plaintiff or one of the other employees, he immediately instructed Bodner to remove it, which he did. (Isaacson Dep. at p. 28, PgID 212.) Bodner was not otherwise disciplined for the sticker. (*Id.*; Domzalski Dep. at p. 80, PgID 125.)

### b.  Other incidents

Plaintiff further testified during his deposition to other alleged incidents during his employment. Plaintiff testified that he and Ullmann had "[m]any issues" when Ullmann was his "mentor," including:

> Excessively having black jokes; excessively talking to me about our black A[ss] president; even conversations of Mr. Ullmann saying that he's done all he could to try and get me off of my – off of my mark, off of my game, trying to frustrate me, and all I did was take it.
>
> ***
>
> And I reported it to Mr. Isaacson.

(Rushton Dep. at p. 78, PgID 163.) Plaintiff testified that he does not remember the exact jokes Ullmann made, and does not remember when he first complained to Isaacson, or whether he gave him any examples of Ullman's "jokes." (*Id.* at pp. 82, 84, 87, 89, 91, PgID 164-66.) Plaintiff did not tell anyone else at EMI that Ullmann told "black jokes," and he does not recall Ullmann telling those jokes after he

8

complained to Isaacson. (*Id.* at p. 92, PgID 166.) Plaintiff also testified that he was told by a co-worker that, in response to being told to do something by one of the managers, Ullman responded "I'm not your nigger," although Plaintiff was not present at the time that statement was allegedly made. (Rushton Dep. at pp. 82-83, PgID 164.) Plaintiff further alleges that another coworker told Plaintiff that Ullmann used the word "nigger" in the workplace without repercussion. (*Id.* at p. 86, PgID 165.)

Plaintiff also complained that he overheard his coworkers, and specifically Darrick Klein, refer to him as "silverback" behind his back or say "that's his nickname, Silverback," "at least a dozen times," although he does not remember if he told Isaacson or anyone else about that. (Rushton Dep. at pp. 103-06, 138-39, 141, PgID 169-70, 178-79.)[1] Plaintiff also stated that at some point during his employment someone wrote the phrase "Big Country versus Silverback" in the dust on a machine. (*Id.* at pp. 102, 104, PgID 169.) Plaintiff states that he told Isaacson about this, but by the time they went to see it, it had been "erased." (*Id.* at pp. 102, 104, 106, PgID 169-70.) According to Plaintiff, Bodner's nickname was "Big

---

[1] Although Plaintiff's counsel wrote in the Response brief that Plaintiff complained of being called "silverback gorilla," and he repeatedly made that same assertion at oral argument, in his deposition, Plaintiff alleged that he was called "silverback," and never used the term "silverback gorilla." (*Compare* Response at pp. 8, 11, 17, 22, PgID 256, 259, 265, 270, *with* Rushton Dep. at pp. 103, 139, 145, 203, PgID 169, 178, 180, 194.)

County." (*Id.* at p. 108, PgID 170.) But according to Defendant, the term "Silverback" is Bodner's mixed martial arts "stage name." (Isaacson Dep. at p. 27, PgID 212; ECF No. 17-16, "Jesse Silverback Bodner" Facebook page, PgID 236.)

Finally, Plaintiff states that some time prior to his resignation, he complained to Isaacson that someone had damaged his toolbox and that people were spitting on his car. (Rushton Dep. at pp. 185-87, 190-92 PgID 190-91.) Plaintiff said that he did not see anyone do those things and does not know who was responsible, and that Isaacson did nothing in response to Plaintiff's complaints. (*Id.*)

### 4. Plaintiff's Resignation

On or around March 7, 2018, Plaintiff approached Isaacson and requested a meeting with Isaacson and Tony Leo. (ECF No. 17-11, Chuck Isaacson Written Statement, PgID 229.) When Isaacson and Leo returned to Plaintiff for the meeting, Plaintiff stated that "everything is fine and he didn't need to talk to us anymore." (*Id.*; Isaacson Dep. at pp. 45-46, PgID 217; Rushton Dep. at pp. 149-56, PgID 181-82.) Plaintiff testified that he did not have the meeting because "everybody in the press room knows" about the meeting and he did not "feel comfortable." (Rushton Dep. at p. 155, PgID 182.)

On Friday, March 9, 2018, Plaintiff told Press Room Department Head Matt Gibson that he was "tired of everyone talking behind his back." (ECF No. 17-9, Matt Gibson Statement dated 3/9/18, PgID 227.) Plaintiff complained that people "keep

poking and prying at him and he is tired of it." (*Id.*) He told Gibson that he took pictures of "swastika's on the Hi-Lo and Hangman sy[m]bols on the table" and that it is "hard on him being the only black man in the Press Room," he "feels like [Gibson] and Chuck [Isaacson] don't like him and he is treated unfair." (*Id.*) Gibson stated he never saw those images in the plant, never had a problem with Plaintiff, and that the two shook hand and "everything seemed fine." (*Id.*)

Later that day, Plaintiff shared the same concerns with Isaacson. (Isaacson Dep. at p. 22, PgID 211.) Isaacson states that this was the first time he had heard of the swastika and hangman issues, that Plaintiff stated he could not remember when the swastika and hangman incidents had happened,[2] and that Isaacson told Plaintiff "we will not tolerate this behavior from anyone and [he] would look into it and get it taken care of." (Isaacson Dep. at p. 23, PgID 211; Isaacson Written Statement, PgID 229-30; Rushton Dep. at p. 89, PgID 166.) Isaacson states that he asked Plaintiff "are we good or do we need to talk to someone else," and that Plaintiff replied "no[,] I just needed to vent and talk with you." (Isaacson Statement, PgID 230-31.) The two shook hands and Isaacson talked to Plaintiff again later that day

---

[2] According to Defendant, Plaintiff produced pictures during discovery he allegedly took of the swastika and hangman. Plaintiff previously provided the pictures to the EEOC, but not to Defendant. (Rushton Dep. at p. 123, PgID 174.) The pictures are dated April 16, 2016 and December 6, 2016, or nearly a year and a half to two years before Plaintiff spoke to Gibson and Isaacson. (Def.'s Mot at p. 6 fn. 2, citing ECF No. 17-10, Photos, PgID 228.)

and stated that "he seemed fine." (*Id.*) Isaacson testified that he checked the hi-los and tool carts that day, but did not find images of a swastika or a hangman. (Isaacson Dep. at p. 38, PgID 215.)

The following Monday, March 12, 2018, Plaintiff told his coworker, Darrick Klein, that he "can't do this" and was quitting. (Rushton Dep. at p. 198, PgID 193.) Plaintiff told Klein that he was "pushed over the edge" because an air still (*i.e.*, a tool that is used to cool dye) was missing from the machine he had worked on the previous Friday. (*Id.* at pp. 198-99, PgID 193.) Plaintiff went to the front office and informed Tony Leo that he was resigning from employment. (*Id.* at p. 202, PgID 194.) According to Leo, Plaintiff stated that he was not happy at EMI anymore, felt "underutilized," and "that he is not looked on the same as some of his co-workers." (ECF No. 17-12, Tony Leo Written Statement, PgID 232.) Leo told Plaintiff about "his importance to the company and if we felt that way about him he would not be running one of the hottest presses in the company." (*Id.*) Plaintiff then informed Leo that he had experienced race-based issues in the workplace, at which point Leo stopped the meeting so he could get Domzalski involved. (*Id.*)

Once Domzalski arrived, Plaintiff stated that his attendance had declined because he "really did not feel like being there" and "wasn't excited to come to work." (Rushton Dep. at p. 208, PgID 195.) Plaintiff stated that his wife is doing really well financially and "we are in a good place." (*Id.*; ECF No. 17-13, Sandy

12

Domzalski Statement, PgID 233.) Plaintiff reported there were "incidents" he had not brought to the Company's attention, namely the swastika drawn on the hi-lo and hangman symbol on a cart. (Rushton Dep. at pp. 208-09, PgID 195-96; Domzalski Statement, PgID 233.) Domzalski asked Plaintiff why he had not brought this to the Company's attention earlier, and Plaintiff stated that it would just make things worse. (Rushton Dep. at p. 209, PgID 196; Domzalski Statement, PgID 233.) Domzalski explained to Plaintiff that "if he does not raise awareness to issues to management, they cannot be addressed" and that "[t]he two incidents in the past 3+ years that he had brought to us had been addressed (Mike Taylor and Paul Tumey situations)." (Rushton Dep. at pp. 209-10, PgID 196; Domzalski Statement, PgID 233.) The meeting ended and Plaintiff left the facility.

After that meeting, Leo and Domzalski met with Isaacson regarding the issues raised by Plaintiff, and she instructed them to conduct another visual inspection of the hi-los and tool carts, which they did. (Domzalski Dep. at p. 73, PgID 124; Domzalski Statement, PgID 233.) Domzalski notes that hi-los and tool carts "moved from building to building from department to department," and no other employee, either African American or Caucasian, ever reported seeing those symbols. (Domzalski Dep. at p. 76, PgID 124; see also Rushton Dep. at pp. 125-26, PgID 175 (acknowledging that Defendant does not assign hi-los or tool carts to specific

employees, and that both move from building to building and department to department).)

## B.   Procedural Background

On May 6, 2019, Plaintiff filed a Complaint in this lawsuit against Defendants EMI, Sandy Domzalski and Chuck Isaacson, asserting six claims for: (1) Count I - race discrimination in violation of the Elliott-Larsen Civil Right Act ("ELCRA"); (2) Count II - retaliation in violation of the ELCRA; (3) Count III - race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (4) Count IV - retaliation in violation of Title VII; (5) Count V - race/ethnicity discrimination in violation of 42 U.S.C. § 1981; and (6) Count VI - retaliation in violation of 42 U.S.C. § 1981. (ECF No. 1, Complaint.) Counts I, II, V and VI, as well as individual defendants Sandy Domzalski and Chuck Isaacson, were dismissed pursuant to the stipulated agreement of the parties. (ECF No. 16.)  Accordingly, the two counts that remain are against Defendant EMI only for (1) hostile work environment racial harassment under Title VII (Count III), and (2) retaliation under Title VII (Count IV).

On June 29, 2020, Defendant EMI filed its Motion for Summary Judgment, arguing that Plaintiff's two remaining claims should be dismissed. (ECF No. 17, Def.'s Mot. S.J.) Defendant argues that Plaintiff's racial hostile work environment claim fails because he cannot show that the alleged harassment was severe or

pervasive, and because Defendant took prompt remedial action with regard to the few claims Plaintiff did bring to its attention. Defendant argues that Plaintiff's retaliation claim should be dismissed because Plaintiff failed to exhaust his administrative remedies with the EEOC, and, even if he had, Plaintiff did not suffer an adverse employment action and there is no evidence of causation.

Plaintiff filed a response in opposition to Defendant's motion on August 10, 2020. (ECF No. 19, Pl.'s Resp.) Plaintiff argues that he has presented sufficient evidence of severe, pervasive racial acts throughout his employment with Defendant, and that he made complaints to management up to the date of his resignation. He also argues that his claims succeed even if he did not follow the procedure set forth in the employee handbook because Defendant had at least constructive notice of his complaints. And, he asserts that he has presented "overwhelming evidence" to support his claim that he was constructively discharged.

On August 24, 2020, Defendant filed a reply brief asserting that Plaintiff has abandoned his retaliation claim because he failed to address it in his response brief. (ECF No. 20, Def.'s Reply.) Defendant asserts it took prompt remedial action on the complaints brought to its attention, and that Plaintiff's vague, unsupported references to additional incidents are insufficient to establish notice of alleged harassing conduct.

## II.  LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able

16

to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III.  ANALYSIS

### A.    Plaintiff's Retaliation Claim (Count IV) is Dismissed

Defendant argues that it is entitled to summary judgment on Plaintiff's retaliation claim because he failed to exhaust his administrative remedies and has no evidence in support of a retaliation claim. (Def.'s Mot. at pp. 21-25, PgID 97-101.) Plaintiff failed to address these arguments or his retaliation claim at all in his

Response brief. Defendant argues that Plaintiff therefore has abandoned this claim and it should be dismissed. (Def.'s Reply at p. 1, PgID 391, citing *Alexander v. Carter for Byrd*, 733 F. App'x 256, 261 (6th Cir. 2018) ("When a plaintiff 'fails to address [a claim] in response to a motion for summary judgment,' the claim is deemed waived.").). As the Sixth Circuit noted in *Alexander*, "[w]here claims are so waived, district courts in this Circuit grant summary judgment as a matter of course." *Alexander*, 733 F. App'x at 261 (collecting cases).

At the hearing on Defendant's motion for summary judgment, Plaintiff's counsel agreed to dismiss Plaintiff's retaliation claim. The Court finds that Plaintiff has abandoned this retaliation claim; that claim is dismissed with prejudice.

### B.    Plaintiff's Hostile Work Environment Claim (Count III)

This leaves Plaintiff's hostile work environment claim against Defendant EMI. Plaintiff alleges that he was subjected to a hostile work environment based on his race. Title VII protects employees from having to work in a "discriminatory hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To survive a motion for summary judgment on a hostile work environment claim that is based on race, a plaintiff must establish the following: (1) that he "belonged to a protected group," (2) that he "was subject to unwelcome harassment," (3) that "the harassment was based on race," and (4) was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment,"

18

and (5) that his employer "knew or should have known about the harassment and failed to act." *Williams v. CSX Trans. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). Defendant argues that Plaintiff cannot establish the third, fourth or fifth prongs of this test. (Def.'s Mot. at p. 11, PgID 87.)

### 1. Whether comments/acts are attributable to Plaintiff's race

Defendant first argues that Plaintiff cannot rely on alleged acts or conduct that are not attributable to his race to establish a hostile environment claim. (Def.'s Mot. at pp. 11-12, PgID 87-88.) Defendant argues that Plaintiff has no evidence that the word "silverback" or the phrase "Big Country v. Silverback" were directed at him or were race-based. Rather, evidence shows that the word "silverback" was used as a "stage name" by one of Plaintiff's coworkers. (*Id.*, citing Isaacson Dep. at p. 27, PgID 212; "Jesse Silverback Bodner" Facebook page, PgID 236.) Defendant further contends that Plaintiff admits that he does not know that his allegations of damage to his toolbox and that someone spit on his car at some unknown time are racially-related incidents. (*Id.*, citing Ruston Dep. at p. 194, PgID 192; and *Kea v. Donahue*, 119 F. Supp. 3d 723, 747 (E.D. Mich. 2015) (finding that plaintiff's complaints that "1) an employee would not give him keys that he needed and it took management a week to find them; 2) some employees suggested it was Plaintiff's job to clean their windows; and 3) someone took tools out of the truck Plaintiff drove, which were replaced after Plaintiff advised Robinson," did not "evidence racial animus.").)

Plaintiff does not directly address this argument in his Response, other than to state "[w]hen determining whether the harassment is based upon his membership in a protected class, nonracial animosity can be admitted because an examination of the totality of the circumstances requires the court to determine whether the incidents were happening only to employees of the protected class." (Pl.'s Resp. at p. 16, PgID 21, citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999).)

A plaintiff can show that harassment was based on race by either putting forth "direct evidence of the use of race-specific and derogatory terms," or by showing that the harassing party treated employees not in the plaintiff's protected class differently. *See Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432 (6th Cir. 2014) (citing *Williams*, 643 F.3d at 511.) Plaintiff admits that he has no evidence that the alleged damage to his toolbox or someone spitting on his car are based on his race, and the Court finds that no racial animus is facially apparent from these incidents. While these alleged incidents may be distasteful, "Title VII does not set forth a general civility code for the American workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Williams*, 643 F.3d at 512 ("[P]lainly, a reasonable jury could not find that the damage to Williams's personal vehicle [and other alleged adverse treatment at work were] based on race. Williams has no direct evidence of racial causation.").

On the other hand, accepting Plaintiff's allegations as true, there is a question of fact as to whether the term "silverback" or the phrase "Big Country v. Silverback," were racially-charged terms directed to Plaintiff, as Plaintiff alleges, or references to Plaintiff's coworker's stage name, as Defendant claims. *See Jackson*, 191 F.3d at 662 ("[E]ven through a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact [of the plaintiff's protected status]."). However, even assuming, at this stage, that these incidents can be deemed based on Plaintiff's race, for the reasons set forth below, these alleged incidents are not sufficiently "severe or pervasive" to constitute an actionable hostile work environment, and Defendant took "prompt, remedial action" to the complaints brought to its attention.

## 2.  Whether the alleged harassment was "severe or pervasive"

Plaintiff must show that "the workplace was permeated with harassment that was 'sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a "mathematically precise test." *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 251 (6th Cir. 1998) (citation omitted). The Sixth Circuit has explained that:

On summary judgment, we look at the totality of the alleged race-based harassment to determine whether it was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 512 (6th Cir. 2011) (alteration in original) (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367). "In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (internal citation omitted). Significantly, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Thus, occasional offensive utterances do not rise to the level required to create a hostile work environment because, "[t]o hold otherwise would risk changing Title VII into a code of workplace civility." *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008) (internal quotation marks omitted).

*Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017) (en banc), *cert. denied*, 138 S.Ct. 980 (2018). "[T]his court has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Id*. The alleged conduct "must be judged by both an objective and a subjective standard." *Abeita*, 159 F.3d at 251. In other words, the conduct "must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Id.* (internal quotation omitted) "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788

(internal citation omitted). The Sixth Circuit "has found even offensive and bigoted conduct insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements." *Phillips*, 854 F.3d at 328 (citations omitted).[3]

In support of his claim that he experienced severe or pervasive harassment during his three-and-a-half-year employment with Defendant, Plaintiff cites to: (1) his testimony that Ullmann told racist jokes and used the word "nigger" in the workplace; (2) a swastika drawing; (3) a confederate flag sticker in the workplace; (4) Tumey's question about getting a tan; (4) Taylor's racially-offensive "joke;" (6) calling Plaintiff "silverback" and the "Big Country v. Silverback" writing; (7) damage to Plaintiff's tools and spit on his vehicle; and (8) the hangman drawing. (Pl.'s Resp. at pp. 16-17, PgID 264-65.)

Defendant argues in its motion that "the isolated and sporadic race-based comments and incidents Plaintiff complains of do not meet the demanding severe or pervasive standard." (Def.'s Mot. at pp. 13, 16-18, PgID 89. 92-94.) Defendant first contends that Plaintiff has not provided any evidence, other than his vague

---

[3] Plaintiff asserts that whether conduct is severe or pervasive is a question of fact. (Pl.'s Resp. at p. 17, PgID 265, citing *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006). However, the Sixth Circuit reaffirmed in *Phillips* that this Court has the "authority to determine that offensive conduct is not severe or pervasive enough to constitute a hostile work environment at summary judgment," citing the "decades of precedent in which the court has done just that." *Phillips*, 854 F.3d at 327 n.4 (collecting cases).

testimony, of when many of the alleged incidents took place throughout his three-and-a-half-years of employment. (*Id.* at pp. 15-16, PgID 91-92.) The Court agrees that Plaintiff's vague allegations that Ullmann made "black jokes" and that he overheard people saying "silverback" behind his back, without specific dates, times, or descriptions, offer little support for the frequency or pervasiveness for his claim of a hostile work environment. *See Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 501 (6th Cir. 2009) ("Indeed, in drawing inferences in her favor for the purposes of summary judgment, we are limited by her total lack of specificity as to verbal abuse she received apart from the aforementioned remarks. She has alleged that she was subject to derogatory sex-based comments on a daily basis, but without specifics it is difficult to adjudge their severity."); *Fuelling v. New Vision Med. Lab. LLC*, 284 F. App'x 247, 259-60 (6th Cir. 2008) ("Most problematic for Fuelling, however, is the fact that she failed to present any evidence to substantiate her conclusory assertions that the remarks occurred "numerous" times, "often," or "regularly" during her two-year tenure with New Vision. Such allegations are unaccompanied by specific instances of racial comments to support her claim that they occurred so frequently as to be severe or pervasive, and give no indication of the time, place, or context of the remarks."); *Johnson v. Ford Motor Co.*, No. 19-10167, 2020 WL 2395205, at *11 (E.D. Mich. May 12, 2020) (Drain, J.) (noting that "while Plaintiff says she was 'constantly' subjected to Mr. Rowan's racially charged

comments, she presents little evidence regarding the frequency of the alleged conduct"); *Hunter v. General Motors LLC*, No. 17-10314, 2019 WL 1436847, at *11 (E.D. Mich. Mar. 31, 2019) (finding plaintiff's inability to provide specific examples of the alleged sexual harassment despite asserting she was subjected to a hostile work environment on a "daily basis" as insufficient evidence for a jury to conclude that she was subjected to a pervasive hostile work environment), *aff'd*, 807 F. App'x 540 (6th Cir. 2020); *EEOC v. Spitzer Mgmt., Inc.*, 866 F.Supp.2d 851, 857-58 (N.D. Ohio 2012) (finding that because plaintiff "cannot recount the frequency of these [alleged racial] comments and could only recall in vague terms the specific words utilized … these terms similarly offer little support for [plaintiff's] claim of a hostile work environment"). In addition, the Court notes that Defendant has presented evidence that the term "silverback" was well known at EMI as Jesse Bodner's mixed martial arts "stage name."

The Court also notes that the three incidents that were brought to its attention, the Taylor and Tumey comments and the confederate flag sticker, were promptly investigated and addressed, supporting Defendant's assertion that it took seriously complaints of harassment of which it was aware.

Defendant also argues that even if Plaintiff was able to identify with any degree of specificity when the complained-of conduct took place, he cannot establish that the alleged incidents he complains of were subjectively offensive, pointing out

that: (1) the Taylor and Tumey incidents were reported to Domzalski by Isaacson and Leo, respectively, not by Plaintiff; (2) Plaintiff testified that he did not ask anyone to stop engaging in any of the conduct he complains of; and (3) Plaintiff encouraged his brother to apply for a job at Defendant as late as August, 2017. (Def.'s Mot. at pp. 16-17, PgID 92-93.) In addition, the Mentorship Program Questionnaire Plaintiff completed in April 2015 is silent as to any racial conduct, and Plaintiff in fact reported that he "worked well together" with Ullmann and does not "think we experienced any conflict." (Mentorship Program Questionnaire, PgID 237.) Similarly, Plaintiff's initial July 2015 Self Review does not mention any inappropriate racial comments or conduct by any coworker, and Plaintiff did not bring anything up with Domzalski during his performance review, even though Domzalski told him that the Company cannot improve the situation if they are not aware of it, in response to Plaintiff's comment that he felt he could be treated more fairly by Isaacson. (Rushton Dep. at p. 117, PgID 173; ECF No. 17-18, Employee Self Review, PgID 238-39.)

Finally, Defendant contends that Plaintiff fails to satisfy the objective prong, arguing that Plaintiff's allegations of isolated jokes, comments and pictures over a three-and-a-half-year period do not meet the "relatively high bar" that is required to sustain a racially hostile work environment claim. (Def.'s Mot. at pp. 17-18, PgID 93-94.) *See Faragher*, 524 U.S. at 788 (a hostile work environment claim cannot rest

26

upon "the sporadic use of abusive language, gender [or race]-related jokes, and occasional teasing."). While there is no magic number of incidents that must occur within a certain period of time, when comparing the conduct Plaintiff here complains of to the conduct alleged in other cases within this Circuit, Plaintiff's claim are insufficient to sustain his hostile work environment claim. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 760-61 (6th Cir. 2000) (incidents including one racial slur directed at plaintiff, racially offensive and obscene cartoon circulated in workplace, and African-American employee referred to as "gorilla" were deemed not severe or pervasive enough to constitute objectively hostile work environment).) *See also Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707-08 (6th Cir. 2007) (fifteen racially-motivated comments and instances of disparate treatment over a two-year period were isolated, not pervasive, and therefore not actionable under Title VII).

Plaintiff does not complain of any "physical" harassment. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2007) (noting that "harassment involving an 'element of physical invasion' is more severe than harassing comments alone") (citing *Williams*, 187 F.3d at 563).

Plaintiff does not complain of any racist conduct targeted to other employees. Plaintiff testified that he does not recall that Jay, an African-American employee in another department, ever raised any concerns about racist conduct or treatment at Defendant. (Rushton Dep. at pp. 232-34, PgID 201-02.) *See Hawkins*, 517 F.3d at

27

335-36 (noting that the Court may consider other acts of harassment directed at others as part of the severe or pervasive test). Significantly, Plaintiff encouraged his brother to apply for employment with Defendant as late as August, 2017, lending further support to the Court's finding that alleged conduct was not severe or pervasive. (Rushton Dep. at pp. 166-67, PgID 185.)

Considering the totality of the circumstances, specifically including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Nat'l R.R. Passenger Corp.*, 536 U.S. at 116 (internal citation omitted), the Court finds that the conduct alleged, while offensive and condemnable, is not sufficiently severe or pervasive to meet the "relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory," *See Phillips*, 854 F.3d at 328.

### 3.  Whether Defendant took "prompt remedial action"

Finally, Defendant argues that even if Plaintiff could meet the demanding severe or pervasive standard, it can only be liable if it "knew or should have known of the conduct and failed to take prompt and appropriate corrective action." (Def.'s Mot. at p. 18, citing *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016).) Plaintiff responds that Defendant had at least constructive notice of

Plaintiff's complaints from his reports to Isaacson, but failed to adequately investigate and remedy them. (Pl.'s Resp. at pp. 18-20, PgID 266-68.)

Defendant states that the record establishes only three race-based incidents involving Plaintiff of which Defendant was aware prior to Plaintiff's resignation – the Taylor, Tumey and Bodner/confederate flag sticker incidents – and, counter to Plaintiff's unsupported claims to the contrary, these incidents were promptly and sufficiently investigated and addressed. (Def.'s Mot. at pp. 19, 21 PgID 95, 97.) Defendant asserts that there is no evidence that anyone in management had knowledge of the alleged hangman and swastika pictures prior to March 9, 2018, and that Defendant then immediately inspected the premises several times but found no such images on March 9 or on March 12, 2018, the day Plaintiff resigned. (*Id.*) Further, no other employees reported seeing such images. Finally, Plaintiff has failed to produce any summary judgment evidence, other than his vague, conclusory testimony, that he reported any additional incidents to anyone at EMI. Defendants argue that Plaintiff failed to follow EMI's written policy for reporting harassment, which requires employees to bring the alleged incidents to the attention of Human Resources, a member of Executive Management, or to the president of the Company, and that Plaintiff only testifies that he approached Isaacson. (*Id.* at p. 20, PgID 96.) And even then, Defendant points out that Plaintiff cannot remember any dates or

times he complained to Isaacson and only offers vague testimony, which is insufficient to survive summary judgment. (*Id.* at pp. 20-21, PgID 96-97.)

The Court finds that Defendant took prompt remedial action with regard to the complaints properly brought to its attention. Defendant investigated the allegations involving Taylor and Tumey, and both employees were disciplined. The employee with the confederate flag sticker or decal was promptly instructed to remove it from his personal toolbox. Plaintiff testified that he had no further negative interactions with these individuals. While Plaintiff asserts that he reported other incidents to Isaacson, he cannot remember dates or specific allegations, and has no other summary judgment evidence corroborating this. Plaintiff testified, moreover, that he does not recall Ullmann telling offensive or inappropriate jokes after he states he complained to Isaacson. Plaintiff failed to bring any of these allegations to the attention of Domzalski or anyone else at Defendant prior to March 12, 2018, the day he resigned, despite opportunities to do so on his Mentorship Questionnaire, in his Self Review or Employment Review meetings with Domzalski, or during his participation on the EMI/QMC Integration Team.

Based on all these facts, the Court finds that Plaintiff cannot establish that Defendant failed to take prompt remedial action in response to the complaints brought to its attention.

## IV.  CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's Motion for

Summary Judgment on Plaintiff's remaining hostile work environment claim against

Defendant EMI and DISMISSES this case with prejudice.

IT IS SO ORDERED.

s/Paul D. Borman
Dated: December 18, 2020                    Paul D. Borman
                                            United States District Judge

31